STATE of Minnesota, Respondent,

v.

Jerald BOITNOTT, Appellant.

No. C6–88–1445.

Supreme Court of Minnesota.

Aug. 4, 1989.
Rehearing Denied Sept. 20, 1989.

Meshbesher, Singer & Spence, Ltd., Jack Nordby, Ronald Meshbesher, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., William F. Klumpp, Jr., Sp. Asst., St. Paul, and Richard T. Jessen, Benton County Atty., Foley, for respondent.

WAHL, Justice.

Defendant Jerald Boitnott appeals his conviction for first degree felony murder, Minn.Stat. § 609.185(3) (1988), second degree (intentional) murder, Minn.Stat. § 609.19(1) (1988), second degree felony murder, Minn.Stat. § 609.19(2) (1988), and second degree assault, Minn.Stat. § 609.222 (1988), in connection with the April 14, 1987, shooting death of his friend Dale Anthony Landwehr. A Benton Coun-

ty District Court jury found Boitnott guilty on all counts and the trial court sentenced him to life imprisonment. On appeal, Boitnott focuses on these issues: the sufficiency of the evidence of intent, the propriety of the trial court's instructions, the admission of testimony regarding a telephone conversation and the prosecutor's improper statements in closing argument. We affirm.

## I.

The jury based its verdict on the following evidence:

On the evening of April 13, 1987, between 4:30–6:00 p.m., Boitnott went to the home of his girl friend Christine Johnson in Sauk Rapids. The two had dinner and drank margaritas before leaving for the home of Boitnott's friend, Doug Larson, where Johnson and Boitnott hoped to get tax advice. While at Larson's, all three drank margaritas and took some valium.

At some point, Boitnott decided to call James Colsch to check on the status of his motorcycle, which Colsch was repairing. Boitnott became angry at Colsch because the repairs had stalled but he later apologized and, according to Colsch, the two became friendly and joked. Boitnott then called another friend, Jim Clink, to ask him to check on the motorcycle repairs. Clink said Boitnott was angry because of the delay in the repairs.

Boitnott asked Larson if Dale Landwehr would have the motorcycle heads needed for the repairs. Larson recalls Boitnott saying he wanted to recover his record albums, which Boitnott believed were stolen by one of the Landwehr brothers from a mutual girl friend, Ginger Solem, in 1981.[1] Boitnott admitted he discussed recovering the albums. Boitnott could not explain why his interest shifted from motorcycle heads to record albums.

Boitnott made a series of phone calls in an effort to locate Dale Landwehr. Apparently, Boitnott looked through the St. Cloud phone directory and called the Land-

wehrs listed. Michael Joseph Landwehr, Dale Gerard Landwehr and Ronald Landwehr all testified they received calls that evening from someone looking for another person named Landwehr. Boitnott became frustrated and angry at being unable to locate Dale Landwehr.

Boitnott admitted calling a bartender at the Benton Station Bar, Steve Coval, in his search for Dale Landwehr. Coval testified that appellant became very abusive and upset when the bartender said that Dale Landwehr was not at the bar. Boitnott called twice and threatened Coval the second time stating, "I am already doing fifteen for doing Dale. You better tell me if he is there. I will do you, too."

Boitnott also apparently made a call to Dale Landwehr, the victim, of which he remembered very little. The phone records show a connection time of five minutes for this call.

During the course of the phone calls, Larson had occasion to tell Boitnott that going to the Landwehr home would not be a wise idea because Dale kept a .44 caliber handgun. Boitnott asked Larson if he had a gun and Larson said yes, showing Boitnott his gun. Boitnott stuck the gun in his pants before leaving. Shortly thereafter, all three people left for the Landwehr residence, which Boitnott had finally located in Foley, Minnesota.

Richard Landwehr, 29, was the youngest of three brothers and lived with his brother, Dale, 33. Richard did not know Boitnott. On the evening of April 13, 1987, Richard had been out but consumed no alcohol and around 12:30 a.m. returned home where his brother Dale was already asleep. The doors of the house were unlocked and all lights were out, except a night light in the kitchen, when Richard went to bed at 12:58 a.m. After going to bed, Richard noticed the lights of a car coming up the drive, then recognized Doug Larson approaching the steps. Richard went down the steps toward the door, turning the hallway light on as he went, but before he got to the kitchen, he heard a

---

1. Solem testified that she had had the albums and that they were stolen, which she told defen-

dant. She denied telling defendant that one of the Landwehrs stole the records.

knock and someone called for Dale. Richard did not invite anyone to come in nor did he hear Dale do so. As he entered the kitchen, Richard saw Larson in the doorway, and Larson asked if Dale was home. Richard said, yes, that he was sleeping.

At that point, Boitnott entered, telling Richard that he had come to get some record albums. Richard said that he didn't know Boitnott and did not have his record albums. Boitnott pulled a revolver out of his jacket, cocked it, and sticking it to the left side of Richard's head, said he had come to get the records and was "not f * * * ing around." Boitnott asked where the records were and Richard pointed into the living room. Boitnott gave Richard a half shove into the living room.

Once in the living room, Boitnott asked where Dale was and Richard pointed to the bedroom and said "he is in there sleeping." Boitnott said to get Dale up. Richard at first was reluctant but Boitnott put the gun to the side of his head while giving another half shove and again said to get Dale.

Richard attempted to wake his brother with little response. Boitnott, who had followed Richard into Dale's bedroom, said, "Get your ass out of bed, I got a gun to your brother's head and I'll kill him." The gun was at Richard's head at this time. Dale, beginning to wake up, said, "Jerry, what the hell are you doing here? What do you want?" To which Boitnott responded, "I came out to get some of my records * * *." Boitnott then placed the cocked gun right between Dale's eyes and told him again to "get your ass out of bed * * *." Dale told Boitnott he did not have the records and told him to leave.

Boitnott asked which of the Landwehrs had been involved with Ginger Solem. When Richard said he had dated Solem five years previously, Boitnott grabbed his arm and, pushing him toward the living room, said, "you're the one I want."

In the living room, Boitnott put the gun between Richard's eyes and told Richard he was serious and to get the records. Richard did so and Boitnott began looking through the records. Boitnott used his gun as a pointer and no longer pointed it at Richard. As he came across two particular records, Boitnott commented that he had previously owned the same albums but added he was sure he wasn't the only person who did. At one point Richard told Boitnott to be more careful with the records and he said, "okay, I'm sorry. I'll stack them up."

After a while, Dale looked out of the bedroom doorway, disappeared and then reappeared with a gun, a Luger .44 caliber, which was cocked. Dale pointed the gun at Boitnott who was facing away from the bedroom. Boitnott turned and, seeing Dale, walked nearer to the doorway with his gun pointing at Dale. When the guns were about six inches apart, Dale said to Boitnott, "Jerry, don't you know you never argue with a man with a bigger gun" and added, "Jerry, look at your gun, it's shaking. Now look at mine, it's not moving."

At this point, face to face, Boitnott grabbed the barrel of Dale's gun and pulled Dale toward himself and then pushed Dale back into the bedroom. Richard heard a sound and believed the two men had run into something. Richard walked into the bedroom and found Boitnott had Dale crouched over, Boitnott's stomach to Dale's back, with the barrel of Dale's gun in one hand and his own gun in the other. Dale's free arm was pinned against his body by Boitnott's arm which was holding Dale's gun. Boitnott was holding a gun to the back of Dale's head and said to Richard, "Your brother better give up his gun before he shoots himself." A few seconds later Boitnott's gun fired while in contact with Dale's head. Boitnott said, "My God, I shot a man and it was an accident."

Medical testimony established that the bullet wound was a contact wound and that Dale Landwehr died as a result of the wound. The tract of the bullet was 0 degrees from top to bottom (i.e., parallel to the plane of the top of the victim's head) and 10 degrees from left to right. The wound was consistent with either an intentional or an accidental shooting. Blood samples showed the victim's blood alcohol

content to be .10% at the time of the death. Boitnott's blood alcohol content was .17% at 3:40 a.m., approximately two hours and twenty minutes after the shooting.

## II.

Boitnott argues the evidence in the record is insufficient to show that he killed Dale Landwehr intentionally. Intent is a necessary element of first degree felony murder, Minn.Stat. § 609.185(3), and second degree intentional murder § 609.19(1), of which Boitnott was found guilty.

We have set out the standard by which to review a challenge to the sufficiency of the evidence thus:

> The standard of review of a jury conviction in an insufficiency-of-evidence appeal is whether, viewing the evidence and any reasonable inferences that could be drawn therefrom in a light most favorable to the state, the jury could reasonably find the defendant guilty beyond a reasonable doubt. In conducting this review, the court assumes the jury believed the state's witnesses and disbelieved evidence to the contrary. The jury determines the credibility and weight to be given the testimony of witnesses.

*State v. Buchanan,* 431 N.W.2d 542, 547 (Minn.1988) (citations omitted).

The specific question before us is, based on the evidence set out above, could a reasonable jury have concluded, beyond a reasonable doubt, that Jerald Boitnott intended to kill Dale Landwehr?

Intent means the actor either has a purpose to do the thing or cause the result specified or believes the act, if successful, will cause that result. *See State v. Harris,* 405 N.W.2d 224, 229 (Minn.1987); Minn. Stat. § 609.02, subd. 9(4) (1988). Intent is a state of mind and is, therefore, generally provable only by inferences drawn from a person's words or actions in light of all the surrounding circumstances. *State v. Andrews,* 388 N.W.2d 723, 728 (Minn.1986). Where findings are "based on circumstantial evidence, the conviction may stand only where the facts and circumstances disclosed by the circumstantial evidence form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980).

■ In this case, the jury was free to believe the testimony of Richard Landwehr who was an eyewitness to the events in the Landwehr home. Richard's testimony, if believed, proved that Boitnott entered the Landwehr home armed and without consent, put a cocked gun to the side of Richard Landwehr's head, threatened to kill Richard, placed the cocked gun between the victim's eyes telling him to get out of bed, placed the cocked gun to Richard's head in the living room, gained physical control over the victim in the struggle, placed the cocked gun to the back of the victim's head, told Richard Landwehr, "your brother better give up his gun before he shoots himself," all immediately prior to the shooting. These facts and the reasonable inferences which may be drawn from them are not inconsistent with previous decisions of this court affirming findings of intent.

In *State v. Harris,* 405 N.W.2d 224, 229 (Minn.1987), we stated that intent to cause death may be inferred from the manner of shooting. In *Harris,* we held that the finding of intent to cause death was supported by the defendant's shooting the victim in the head from three or four feet, with a sawed-off shotgun, *id.,* and affirmed the conviction of first degree murder. It is true that a .22 revolver could hardly be expected to cause the same kind of massive damage as a shotgun blast but a contact gunshot from a .22 revolver to the back of a person's head would be considered nearly as likely to cause death in most minds. Thus, the manner of shooting in this case gives rise to a reasonable inference of intent. Additionally, in *State v. Campbell,* 281 Minn. 1, 13, 161 N.W.2d 47, 55 (1968), we found intent to kill was supported by the defendant's preparations for a robbery, taking a gun and ensuring it was loaded. Like the instant case, in *Campbell* the defendant was pointing a gun at the victim, who resisted by throwing a boning knife at

the defendant. *Id.* at 4, 161 N.W.2d at 50. We affirmed the conviction in *Campbell* despite the aggressive act of the victim.

Boitnott points to several allegedly uncontroverted facts, which he asserts show the instant shooting was an accident. The most salient of these facts are: the struggle between Boitnott and the victim; Boitnott's intoxication; Boitnott's relatively peaceful examination of the records; Dale Landwehr's pointing a gun at Boitnott; Boitnott's contemporaneous declaration that the shooting was an accident; and his fear of Dale Landwehr. Boitnott seems to confuse the standard of review. The question before us is not whether this court finds these "uncontroverted facts" are consistent with an accidental shooting. Rather, the question is, could a reasonable jury conclude beyond a reasonable doubt that, despite the above facts, the only reasonable inference to be drawn from all the evidence, now viewed most favorably to the state, is one of intentional killing? It is true that the struggle between Boitnott and Dale Landwehr tends to lessen the nexus between Boitnott's preparatory acts, his hostile entry into the Landwehr home, his verbal threats and the shooting. Nevertheless, given Boitnott's physical control of the struggle with the victim, and in light of our decisions in *Harris* and *Campbell,* we cannot say the jury here was unreasonable for finding the only reasonable inference was one of intentional homicide. We hold the evidence was sufficient to prove intent beyond a reasonable doubt.

### III.

Boitnott raises several challenges with regard to the trial court's instructions to the jury. We examine first the trial court's refusal to instruct the jury on the theory of self-defense. Boitnott correctly notes that in Minnesota it is the state's burden to disprove beyond a reasonable doubt a claim of self-defense. *Buchanan,* 431 N.W.2d at 548. This court has also said that "[i]t is beyond dispute [defendant] is entitled to an instruction on his theory of the case if there is evidence to support it." *State v. Ruud,* 259 N.W.2d 567, 578 (Minn.1977). Nevertheless, this court has upheld a trial

court's refusal to give a self-defense instruction when requested where the defendant was the aggressor in the fatal incident and he or she did not actually or in good faith try to withdraw from the conflict. *See Bellcourt v. State,* 390 N.W.2d 269, 272 (Minn.1986); *see also State v. Robinson,* 427 N.W.2d 217, 227–28 (Minn.1988).

In *State v. Graham,* 371 N.W.2d 204 (Minn.1985), we explained the preliminary burden a defendant must meet in order to justify a self-defense instruction,

> While there is no burden on a defendant to prove self-defense, the defendant does have the "burden of going forward with evidence to support his claim of self-defense." *State v. Columbus,* 258 N.W.2d 122, 123 (Minn.1977). If the defendant does not go forward with such evidence, there is no right to the self-defense instruction. The process of going forward with evidence is complete when the defendant submits "reasonable evidence that the victim was committing an independent assault on defendant at the time defendant fired the gun." *State v. Johnson,* 310 N.W.2d 96, 97 (Minn.1981).

*Graham,* 371 N.W.2d at 209.

Boitnott argues that because he was "peacefully" looking through the stack of records when Dale stepped out of the bedroom and pointed a gun at him, he was not the aggressor in the ensuing conflict, and thus the requested jury charge should have been given. Boitnott's view of the facts, however, can only be said to satisfy the test in *Graham* if one ignores his previous actions. This we cannot do. Boitnott remained at all times an armed trespasser in the Landwehr home. That there was a break in Boitnott's otherwise continuous stream of verbal threats and threatening gestures with his handgun does not constitute an actual or good faith effort to withdraw from the conflict as that term is used in *Bellcourt.* Failing to show that he satisfies the withdrawal requirement of *Bellcourt,* Boitnott has not met the burden of going forward with the evidence to support his claim of self-defense, which we articu-

lated in *Graham.*[2] We hold the trial court did not err in refusing to give the requested instruction on self-defense under the facts and circumstances of this case.

Although Boitnott did not request a separate instruction on accident nor object to the trial court's instructions regarding the elements to be proven, he now argues that the trial court erred in failing to give an instruction on accident. Evaluating essentially the same claim in *State v. Schluter,* 281 N.W.2d 174 (Minn.1979), we said:

> It is true that "a party is entitled to an instruction on his theory of the case if there is evidence to support it." But it is also true that "The court need not give the instruction as requested by the party if it determines that the substance of that request is contained in the court's charge."

*Id.* at 176–77 (citation omitted). In *Schluter,* we went on to hold no accident instruction was required because the trial court made it "very clear that the jury could not convict defendant" of the crimes charged unless the jury was convinced the defendant killed the victim intentionally. *Id.* at 177.

▪ In the instant case, the trial court instructed the jury as to first degree felony murder and second degree intentional murder. The trial court described each charge against the defendant, explaining that the act must be intentional. Additionally, the court explained the concept of intent when instructing on the elements of each of the charges but made no mention of the word accident in any of its instructions on murder or manslaughter. Though such an instruction might be helpful, where the trial court made clear that the jury could convict on first degree felony murder and second degree intentional murder only if the state proved the defendant intentionally caused the death of the victim, no separate accident instruction was required.

▪ Boitnott contends the trial court erred in failing to give a jury charge on first degree manslaughter. Minn.Stat. § 609.20 (1988). We note defense counsel

did not object or ask for any change in the court's proposed instructions. The test for determining whether lesser degrees of a crime are to be submitted to a jury is:

> (1) whether the evidence would reasonably support a conviction of the lesser crime, and (2) whether the evidence would also support a finding of not guilty of the greater crime. Where the evidence warrants such an instruction, the trial court must give the appropriate instructions. Unless the defendant waves such instructions, it is error not to submit the lesser degrees to the jury, except in the extraordinary situation where failure to do so is otherwise supported by a proper exercise of the trial court's discretion and no prejudice to the defendant results.

*State v. Lee,* 282 N.W.2d 896, 899 (Minn. 1979) (citations omitted). Assuming arguendo Boitnott did not waive his right to the instruction now requested, by failing to object to the proposed instructions, he still fails to identify any evidence or describe any theory on which a first degree manslaughter instruction might be based. We therefore reject the defendant's argument. The trial court did instruct the jury on manslaughter in the second degree but the jury did not make that choice. We find Boitnott's other arguments regarding instructions to be without merit.

## IV.

Boitnott also contends that the trial court abused its discretion in allowing into evidence a phone conversation, which was testified to by Steve Coval, the bartender at Benton Station. Coval said the caller, apparently Boitnott, was looking for Dale Landwehr and said to Coval, "I'm already doing fifteen for doing Dale. If you're lying to me, I'm going to come down there and do you too." Coval never identified the caller in his testimony. Boitnott argues that the call lacked foundation, Minn. R.Evid. 901(a), (b)(5), and was irrelevant or that its probative value was outweighed by its prejudicial effect, Minn.R.Evid. 403.

2. In keeping with the presumption of innocence, trial courts should resolve all doubts as to the legitimacy of a self-defense claim in favor of the defendant.

The admissibility of this phone call was discussed several times by the trial court and counsel. In a pretrial discussion, on the record, defense counsel specifically stated he did not intend to contest the fact that Boitnott made the phone calls, which included the call in question. Rule 103(a)(1), Minn.R.Evid., provides that errors may not be based on the admission of evidence unless a timely and specific objection is made to the evidence. Thus, Boitnott, by his affirmation to the contrary, has waived his appeal based on foundation grounds.

Minn.R.Evid. 403 reads:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Interpreting this rule, we have said that trial courts have wide discretion in determining relevance and the probative value of evidence. *See State v. Swain,* 269 N.W.2d 707, 714 (Minn.1978). The test the trial court is to use in determining admissability under the rule is the basic test of Minn.R.Evid. 403, whether the potential of the evidence for unfair prejudice outweighs its probative value. *State v. Czech,* 343 N.W.2d 854, 857 n. 1 (Minn.1984). The trial court here, after considering this piece of evidence on several occasions and listening to counsel several times, decided to admit the comment, despite its confusing nature, as bearing on Boitnott's state of mind. We hold the trial court did not abuse its discretion in admitting the phone conversation into evidence.

### V.

Finally, Boitnott argues that the prosecutor's closing argument to the jury was improper and requires reversal.[3] This court has indicated that a two-tier test is to be applied in examining allegedly improper arguments. In cases involving serious misconduct, the court requires certainty be-

yond a reasonable doubt that the error was harmless. *State v. Caron,* 300 Minn. 123, 128, 218 N.W.2d 197, 200 (1974). In a case involving less serious misconduct, the test is whether the misconduct played a substantial part in influencing the jury to convict. *Id.* A careful examination of the prosecutor's closing argument discloses no misconduct which is either serious or which could be said to have played a "substantial part in influencing the jury" and we so hold.

The convictions are affirmed.

Affirmed.

---

3. The state argues that defense counsel failed to object to all but one of the "improper" remarks he now appeals. Normally, counsel must object to the improper comment at trial or the objection is waived. *State v. Spaulding,* 296 N.W.2d 870, 876 (Minn.1980).