Jerald W. BOITNOTT, Petitioner,
Appellant,

v.

STATE of Minnesota, Respondent.

No. C4–01–243.

Supreme Court of Minnesota.

July 26, 2001.

Jerald W. Boitnott, pro se.

Mike Hatch, Attorney General, Thomas R. Ragatz, Assistant Attorney General, St. Paul, Michael Scott Jesse, Benton County Attorney, Foley, for respondent.

**OPINION**

RUSSELL A. ANDERSON, Justice.

Appellant Jerald Boitnott appeals from the denial of his second petition for postconviction relief, in which he raised multiple ineffective assistance of trial and appellate counsel allegations. Prior to the instant appeal, Boitnott filed a direct appeal from his conviction of first-and second-degree murder, obtained an admonition of trial counsel from the Director of the Lawyers Professional Responsibility Board on an unrelated matter, filed a civil legal malpractice claim against trial counsel, filed a first petition for postconviction relief, and sought a writ of habeas corpus in federal court.[1] Boitnott's ineffective assistance of trial counsel allegations were undisputedly raised, but not necessarily decided on the merits, in prior proceedings. His ineffective assistance of appellate counsel claim is based solely on his attorneys' failure to argue ineffective assistance of trial counsel on direct appeal. Boitnott now asks this court to address all claims on the merits and reverse the postconviction court's conclusion that relief is not warranted. Upon review of Boitnott's claims, we conclude that he has not stated allegations sufficient to warrant postconviction relief, and we affirm.

On April 14, 1987, Boitnott, intoxicated and carrying a loaded gun, entered the home of Dale Landwehr and sought to obtain record albums he believed either Landwehr or Landwehr's brother had stolen. *State v. Boitnott*, 443 N.W.2d 527, 529–31 (Minn.1989) (*"Boitnott I"*).[2] Both Landwehrs were at home and aware of

---

1. Boitnott had different attorneys in each of the civil and criminal proceedings relating to his murder case and had different district court judges assigned to his murder trial, malpractice case, and each of his postconviction petitions.

2. A more complete recitation of the facts can be found in this court's opinion on Boitnott's direct appeal.

Boitnott's presence, but there is no dispute that Boitnott was armed and uninvited. *Id.* at 529–30. While Boitnott was looking through Landwehr's record albums, Landwehr came up behind him, pointing his own gun at Boitnott. *Id.* at 530. After a scuffle in which Boitnott apparently gained the upper hand, Boitnott's gun fired, killing Landwehr. *Id.* Boitnott was indicted on counts of first-degree felony murder, second-degree felony murder, second-degree intentional murder, and second-degree assault.

In the course of pretrial proceedings in July 1987, Boitnott's counsel moved for a change of venue, claiming that a fair trial was not possible in Benton County. In response, the state submitted a number of Minnesota newspaper articles discussing events surrounding the shooting and Boitnott's arrest. Although two articles focused on the reactions of Landwehr's friends to his death, the state pointed out that "[t]he news reports are factual and without opinions or implications of guilt." Boitnott then retained the National Jury Project to take public opinion surveys and determine whether Boitnott could receive a fair trial in Benton County. Boitnott alleges that six of the eight individuals surveyed were asked what percentage of people they knew believed Boitnott was guilty. The six responses were: "Most, 95%, 80–85%, 50–60%, 50%, and Low." In addition, Boitnott cites a 1998 article in a local newspaper reporting that 27 of 35 people surveyed stated that the Landwehr shooting was the top story of 1987.[3]

Before trial, the following conversation occurred in the judge's chambers:

The Court: We have had some off the record general discussions, and I would like the record to reflect some of the discussions before we proceed in the presence of the Defendant. First of all, with reference to the previous motion for change of venue, Counsel for the defense has advised me that he anticipates withdrawing that motion. Is that correct?

Counsel: That's correct, Your Honor.

The Court: You understand that, Mr. Boitnott?

Defendant: I do.

The change of venue issue was not raised again during the trial.

After the jury was sworn, a juror contacted the bailiff and asked to see the judge. During an in-chambers discussion at which the prosecuting and defense attorneys, but not Boitnott, were present, Juror Janice Sowada stated that she had seen her sister, Karen Ewing, sitting in the courtroom. Sowada acknowledged her awareness of Ewing's acquaintance with some people involved in the case, but stated that she believed Ewing was friends with both Boitnott's and Landwehr's families. Sowada said that although she did have regular contact with Ewing and had cut out newspaper articles regarding the shooting at Ewing's request, Sowada was not acquainted with any of the people Ewing knew and "had no idea" her sister was so interested in the case as to be at the trial. Sowada also explained that she never mentioned this connection before because "[y]ou never did ask do I know somebody that knows somebody* * *."[4]

---

**3.** Although Boitnott discussed the survey and newspaper article in both his postconviction petitions and in his current appeal, the survey, its results, and the actual newspaper article are not in the appellate record. Thus, there is no record of the exact framing of the

questions or the population of Benton County residents from which interviewees were drawn.

**4.** The subjects covered in Sowada's voir dire were her general background, her familiarity

Lastly, Sowada said that "I wanted it known that she is there. I don't know if it makes any difference to you. I don't know. It doesn't to me."

After defense counsel questioned Sowada about the closeness of her relationship to Ewing and whether Ewing's presence would influence her, both attorneys and the court agreed that removing Sowada from the jury was unnecessary. The court then called Ewing into chambers and instructed her to avoid contact with Sowada while the trial was occurring and to avoid showing her reactions while sitting in the courtroom. Boitnott was not informed of these discussions until after the trial.

Boitnott was convicted in February 1988 on all four counts in the indictment. On appeal, this court held that the evidence was sufficient to support conviction, that Boitnott was not entitled to specific accident or self-defense jury instructions, that admitting a telephone conversation as evidence was not an abuse of discretion, and that the prosecutor did not commit reversible misconduct in his closing argument. *Boitnott I*, 443 N.W.2d at 532–34.

In Boitnott's subsequent civil malpractice action, he alleged, in addition to issues unrelated to his murder case, that his trial counsel failed to communicate an offer from the state to allow Boitnott to plead guilty to second-degree murder alone. *Boitnott v. Cascarano*, No. C4–96–520, 1996 WL 523816, at *2 (Minn.App. Sept.17, 1996), *rev. denied* (Minn. Dec. 17, 1996). The district court granted summary judg-

ment in counsel's favor and the court of appeals affirmed, each finding no evidence that such an offer existed. *Id.* at *1.

Meanwhile, on April 14, 1992, the Director of the Office of Lawyers Professional Responsibility admonished trial counsel for failure to communicate with Boitnott regarding the status of an unrelated controlled substance tax case, and for making substantive decisions in that case without consulting Boitnott. Although the Director recognized in the memorandum accompanying the admonition that Boitnott had also complained about his trial counsel's performance in the murder case, the Director conveyed the Board's conclusion that discipline was not warranted on those matters.

On February 10, 1997, Boitnott brought his first postconviction petition alleging that trial counsel provided ineffective assistance in withdrawing a change of venue motion and in failing to communicate a plea offer to Boitnott or seek the removal of Juror Sowada. In support of his biased juror and change of venue claims, Boitnott relied on a December 1992 telephone conversation between Sowada and a private investigator Boitnott hired. According to the investigator, Sowada said that she "knew that her sister * * * was sitting on the Landwehr side of the court room and she was there to support the Landwehr family. Sowada also claimed that she knew her sister did not know or support Jerry Boitnott."[5] Sowada also said that

---

with guns, her husband's work at a reformatory, and her beliefs regarding drugs, alcohol, presumptions of innocence, and burdens of proof. Sowada was not asked whether she or anyone she knew was acquainted with persons involved with the shooting.

Sowada was asked what she knew about the case and stated that she remembered hearing about "an individual going to somebody's home and an argument came up [and

t]he pistol went off * * *." Sowada responded in the negative when asked if she knew how the gun fired. When asked about newspaper articles, Sowada answered that she remembered an article about the funeral, but little else. When asked whether she had a problem presuming Boitnott innocent, Sowada answered "No."

5. Boitnott appended the investigator's 1992 reports to his appellate brief, but has not

the jury's verdict was "because of the evidence and not because her sister knew someone who was involved."

The same private investigator also reported a conversation with Sowada's sister, Karen Ewing, who stated that at the time of trial Sowada knew Ewing was friendly with the Landwehr family and not with Boitnott. Upon hearing that Sowada was to be on the jury, Ewing allegedly told Sowada that she wanted her off the jury. Ewing told the investigator that she said this because she (Ewing) was too personally involved with the victim and would have been mad if Boitnott was not convicted. It is not clear whether Ewing conveyed these reasons to Sowada. Ewing confirmed that she did not contact Sowada during the trial and relayed that Sowada said after trial that "Boitnott was convicted because the way the law read."

In addition to the alleged plea offer, biased juror, and change of venue issues, Boitnott cited a number of other alleged errors of trial counsel, primarily consisting of failure to investigate the case, prepare for trial, or raise timely objections. Without detailing any facts to support these claims, postconviction counsel stated that "[a]lbeit, Cascarano's further errors fall under the broad umbrella of trial tactics and standing alone may not qualify as ineffective assistance, they, when added to an overall lack of communication, do result in prejudice to Boitnott."

Based on these claims, Boitnott's postconviction counsel scheduled an evidentiary hearing and subpoenaed witnesses without permission from the assigned judge. The court noted that "an evidentiary hearing on postconviction relief petitions is to be held only in the discretion of the trial judge unless the * * * pleadings raise a material fact dispute." The court then submitted an affidavit from the investigator,

determined that a hearing was not warranted if the doctrines of collateral estoppel or res judicata, along with the district court's and court of appeals' conclusions in Boitnott's civil case that the state did not extend a second-degree murder plea offer, precluded Boitnott from alleging trial counsel's failure to communicate the plea offer. As a result, the court cancelled the hearing and quashed the subpoenas so that the parties could submit briefs discussing the collateral estoppel/res judicata issues. The court ultimately denied relief, concluding that because no new evidence was offered, the prior courts' conclusions that no plea was offered barred Boitnott's postconviction claim. The court did not address the other issues Boitnott raised in his postconviction petition.

On appeal, Boitnott argued only that res judicata and collateral estoppel did not bar his postconviction claim. This court affirmed, stating "[b]ecause we conclude that Boitnott has submitted no evidence tending to show that a second-degree plea offer was ever extended by the state, we need not address the issue of the application of collateral estoppel." *Boitnott v. State*, 582 N.W.2d 243, 245 n. 2 (Minn.1998) ("*Boitnott II*").

On November 30, 1998, Boitnott filed a petition for a writ of habeas corpus with the United States District Court. Boitnott alleged that trial counsel improperly failed to inform Boitnott of the in-chambers discussion with Juror Sowada, develop self-defense and accident theories, present change of venue evidence, investigate, conduct discovery, and make timely objections. The magistrate deemed these claims "unexhausted" and declined to review them because Boitnott stated no reason why he failed to raise these claims in Sowada, or Ewing.

his state court appeal from the denial of postconviction relief.

The magistrate concluded that Boitnott had properly exhausted both the matter of trial counsel's alleged failure to communicate a plea offer and the issues raised on direct appeal. Nonetheless, the habeas petition was denied because the court agreed with this court's characterization of the facts, found sufficient evidence to support the conviction, declined to review the denial of an evidentiary hearing as strictly a matter of state law, and concluded that the jury instructions and admission of evidence were not erroneous.

In August 2000, Boitnott brought a second petition for postconviction relief, alleging that trial counsel was ineffective in failing to: (1) communicate the in-chambers discussion with Sowada or seek her removal for bias; (2) seek a change of venue; (3) investigate and prepare defenses; and (4) make timely objections. Boitnott acknowledged that these claims were all raised in his first postconviction petition. Boitnott also alleged that he received ineffective assistance of counsel on direct appeal. Because neither this court nor the court of appeals addressed these claims in any prior proceeding, Boitnott claimed that he was entitled to have them adjudicated on their merits after an evidentiary hearing and to have the judgment of conviction and sentence vacated.

■ The Benton County District Court denied Boitnott's petition, concluding that the claims regarding Juror Sowada and counsel's "cumulative errors," including failure to investigate, prepare defenses, and make timely objections, constituted

successive petitions for similar relief warranting summary denial under Minn.Stat. § 590.04, subd. 3 (2000). The court addressed the change of venue issue on the merits and concluded that Boitnott did not show that a fair trial was impossible in Benton County. The court further held that a *Schwartz* hearing [6] was unnecessary because there was no evidence of actual juror misconduct. Last, the court concluded that appellate counsel was not ineffective in declining to raise ineffective assistance of trial counsel claims because Boitnott would not have prevailed on the underlying claims against trial counsel. Boitnott appeals from the denial of postconviction relief.[7]

■ A petition for postconviction relief is a collateral attack on a conviction, which carries a presumption of regularity. *Hummel v. State,* 617 N.W.2d 561, 563 (Minn.2000). "The scope of review of a postconviction proceeding is limited to determining whether there is sufficient evidence to sustain the postconviction court's findings, and a postconviction court's decision will not be disturbed absent an abuse of discretion." *Perry v. State,* 595 N.W.2d 197, 200 (Minn.1999); *see also State v. Doppler,* 590 N.W.2d 627, 633 (Minn.1999) (placing the burden on appellant to prove an abuse of discretion). We hold that the postconviction court did not abuse its discretion in concluding that the claims in Boitnott's petition for relief were either procedurally barred or did not warrant relief on the merits.

## I.

■ We begin with the state's argument that Boitnott's claims are procedurally

---

**6.** *Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (Minn.1960). The purpose of a *Schwartz* hearing is to investigate alleged juror misconduct. *State v. Martin,* 614 N.W.2d 214, 226 (Minn.2000).

**7.** In addition to the claims raised in his postconviction petition, Boitnott asserts on appeal that his attorney failed to communicate a plea offer. Because we addressed this issue on the merits in the course of Boitnott's first postconviction appeal, we will not revisit it here.

barred. At least five of Boitnott's claims were raised in his previous petition, prior appeals, or both, and the last claim—the plea offer issue—was raised *and* decided in Boitnott's first postconviction appeal. Thus, the state contends that Minn.Stat. § 590.04, subd. 3, and this court's holding in *State v. Knaffla*, 309 Minn. 246, 243 N.W.2d 737 (Minn.1976), bar Boitnott from raising the same claims in this second petition for postconviction relief. *See* Minn. Stat. § 590.04, subd. 3 ("The court may summarily deny a second or successive petition for similar relief on behalf of the same petitioner and may summarily deny a petition when the issues raised in it have previously been decided by the court of appeals or the supreme court in the same case."); *see also Hale v. State*, 566 N.W.2d 923, 926 (Minn.1997) ("[O]nce a direct appeal has been taken, any matter raised and any claim known but not raised, will not be considered upon a subsequent petition for postconviction relief. This *Knaffla* bar includes claims for ineffective assistance of trial counsel.") (citing *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741).

Although he readily acknowledges that the current claims were raised in his first postconviction petition, Boitnott argues that neither Minn.Stat. § 590.04 nor *Knaffla* bar his claims until they are known and, if raised, *addressed* by an appellate court. Boitnott further argues that the policies behind *Knaffla*'s bar on the relitigation of claims does not apply here because Boitnott's claims have never been "litigated"—that is, resolved on their merits—in the first place.

We have said, however, that "[s]ection 590.04, subd. 3, gives the postconviction court discretion as to whether it will consider or summarily deny successive petitions for similar relief." *Perry*, 595 N.W.2d at 200. Because Boitnott brought a successive petition for similar relief, it was within the postconviction court's discretion to deny the petition without holding an evidentiary hearing. Furthermore, although *Knaffla* dealt with a postconviction petition raising claims known and not raised on direct appeal, whereas Boitnott brings a petition stating claims raised but not decided in a prior petition, *Knaffla's* rationale is analogous here. Boitnott had the opportunity to raise his current claims in either his direct appeal or, for those claims not known at the time of the direct appeal or not raised due to the alleged ineffective assistance of appellate counsel, on appeal from denial of his first postconviction petition. Because Boitnott knew about these issues prior to his first postconviction appeal and did not raise them at that time, his claims now are barred on procedural grounds and the district court did not abuse its discretion in declining to conduct an evidentiary hearing or in denying relief.[8]

## II.

Despite the *Knaffla* bar that attaches to Boitnott's ineffective assistance of trial

---

8. Additionally, Boitnott's delays in bringing his first and second petitions for postconviction relief weigh against him. *See Hummel*, 617 N.W.2d at 564–65 (holding that 9–year delay weighed against appellant where he offered no explanation for the delay). Although Boitnott alleged in his first postconviction petition that he did not have the information necessary to raise some of his claims until the private investigator relayed his findings in 1992, Boitnott did not bring his first postconviction petition until February of 1997. By then, 9 years had expired since the trial's conclusion, approximately 7–1/2 years since his appeal, and more than 4 years since the private investigation. *See Fox v. State*, 474 N.W.2d 821, 826 (Minn.1991) (holding that filing postconviction petition 7 years after appeal, 8 years after conviction, and 4 years after ending the drug use that allegedly made petitioner unable to bring a petition for relief weighed against petitioner).

counsel claims, we have at times opted to review an appellant's claims on the merits in the interests of justice. *See, e.g., Scruggs v. State,* 484 N.W.2d 21, 25 (Minn. 1992); *Fox,* 474 N.W.2d at 825. We conclude that this is one of those occasions and therefore address the substance of Boitnott's allegations.

■ To prove ineffective assistance of counsel, Boitnott must show that his representation "fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998) (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). There is a strong presumption that counsel's performance was reasonable. *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986). We address each of Boitnott's allegations in turn, beginning with his claim that trial counsel committed "cumulative errors" in failing to research and develop the self-defense theory, investigate and prepare an accidental discharge defense, or make timely objections to the admission of evidence and to the prosecutor's closing arguments.

Boitnott bases his argument that trial counsel was ineffective in failing to develop accidental discharge and self-defense theories on four assertions: (1) trial counsel did not prepare a jury instruction regarding self-defense even though he focused on a self-defense theory at trial; (2) trial counsel could not remember in his deposition, which was taken in connection with Boitnott's civil malpractice case 5 or 6 years after the trial, what evidence he used in his effort to convince the trial court to give a self-defense instruction; (3) in a deposition taken around the same time, the prosecuting attorney posited that accidental discharge of the gun was the best defense; and (4) in the following conversation just before trial, the trial court stated its concern that Boitnott's counsel was still investigating the case after trial began:

Counsel: We do the investigation the way we want to do the investigation.

Court: You don't necessarily do it when you want to do it.

Counsel: I disagree with that.

Court: You think you can do it right through trial?

Counsel: Absolutely.

Court: When you have had ample opportunity to do it prior to that time?

Counsel: Yeah. I don't see where Rule 9 tells me at all when I'm supposed to do my investigation on the case.

■ This court has already addressed the jury instruction issue and held that the evidence did not support a self-defense instruction, while the accident theory was adequately represented in the instructions given. *Boitnott I,* 443 N.W.2d at 532–33. Moreover, the prosecutor's deposition statements, taken in context, indicate his opinion that accidental discharge *was* the primary defense presented at trial. Neither the prosecutor's statements, nor trial counsel's inability to recall 5 years after trial exactly how he went about defending Boitnott, show that the level of counsel's investigation and presentation of the defense theories was objectively unreasonable.

■ As to Boitnott's other "cumulative error" allegations, we have stated that the level of investigation and whether to object are matters of trial strategy that the court generally will not review. *See Lahue,* 585 N.W.2d at 790 (extent of investigation constitutes trial tactics); *State v. Rainer,* 502 N.W.2d 784, 789 (Minn.1993) (decision not to object constitutes trial strategy). Furthermore, a petitioner's allegations in a postconviction petition must

be "more than argumentative assertions without factual support." *Beltowski v. State*, 289 Minn. 215, 217, 183 N.W.2d 563, 564 (1971). Other than the trial court's comments, Boitnott does not provide evidence supporting his claims that trial counsel did not interview witnesses, conduct discovery, or visit the scene of the shooting. Given the trial court's conclusion that the interests of justice did not warrant a new trial despite Boitnott's motion, the court's stated concerns are by themselves insufficient to establish ineffective assistance of trial counsel. Additionally, although Boitnott raised trial counsel's "cumulative errors" in the 1997 petition, he acknowledged that these "errors" "fall under the broad umbrella of trial tactics and standing alone may not qualify as ineffective assistance." This statement, followed by bare assertions of trial counsel's failings without substantive support, indicate that these "cumulative error" claims were raised but essentially abandoned even before the district court addressed them.[9] Thus, the postconviction court did not abuse its discretion in denying relief on these claims.

Boitnott also argues that the trial court erred in allowing Sowada to continue as a juror after the in-chambers discussion at which he was not present. Boitnott contends that Sowada's prejudice is evidenced by the fact that she lied on voir dire. *See State v. Stofflet*, 281 N.W.2d 494, 498 (Minn.1979) (noting that a juror's false answers on voir dire in order to conceal bias may deprive defendant of a fair trial). To show that Sowada lied, thereby tainting the jury's verdict and necessitating a *Schwartz* hearing or new trial, Boitnott alleges that Ewing told Sowada before trial that she wanted Sowada off the jury and would be mad if Boitnott was not convicted; that Sowada stated during voir dire she had seen only one newspaper article about the shooting and did not know who Ewing was supporting; that Sowada stated in chambers that she had saved newspaper articles for her sister; and that Sowada told the investigator that she knew Ewing did not support Boitnott.

We have said that "although the defendant should be present during an on-the-record in-chambers discussion with a juror, his absence is not ground for a new trial if he was not prejudiced by not being present." *State v. McGath*, 370 N.W.2d 882, 886 (Minn.1985); *see also State v. Pederson*, 614 N.W.2d 724, 730 (Minn.2000) (stating that a defendant establishes a prima facie case that a *Schwartz* hearing is necessary only by submitting sufficient evidence that by itself indicates jury misconduct). Consequently, the question underlying the juror issues here is whether Boitnott was denied his right to trial by an impartial jury. *See McGath*, 370 N.W.2d at 886. "Because the decision whether [an] affected juror may

---

9. In addition, Boitnott's claim that his attorney was ineffective because he failed to make timely objections is actually a restatement of arguments on direct appeal that the prosecutor committed misconduct in his closing argument and that the trial court erroneously admitted a prejudicial telephone call as evidence. This court held that there was no prosecutorial misconduct; thus, any failure of trial counsel to pursue that argument would not have affected the outcome of the trial. *See Boitnott I*, 443 N.W.2d at 534; *see also Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

Boitnott also argues that his trial counsel was ineffective in waiving any argument that the telephone call was not only prejudicial, but also lacked foundation. *See Boitnott I*, 443 N.W.2d at 534. Regardless of whether the evidence lacked foundation, Boitnott does not show how its admission affected the trial's outcome. Although he reasserts that the evidence confused the jury, this court held on direct appeal that the trial court did not abuse its discretion in admitting the evidence "despite its confusing nature." *Id.*

continue to sit involves determinations of credibility and demeanor, which are best left to the trial court, this court affords the trial court's decision significant deference." *State v. Richards,* 552 N.W.2d 197, 210 (Minn.1996).

█ The record of Sowada's voir dire and subsequent discussion of her sister's presence support the trial court's conclusion that Sowada did not intentionally conceal Ewing's relationship with the victim or lie to conceal a bias. It is not an abuse of discretion to deny a *Schwartz* hearing requested on the basis of a juror's alleged dishonest answers in voir dire where "defense counsel did not ask the sort of clear question that, absent a lack of credibility on the juror's part, necessarily would have elicited the disclosure of the sort of information that the [juror] withheld." *State v. Benedict,* 397 N.W.2d 337, 340 (Minn. 1986). Although Sowada was not asked during voir dire whether she knew anyone acquainted with the interested parties, she voluntarily informed the court of her sister's presence as soon as she discovered it. Based on this fact and on observation of Sowada's responses to in-chambers questioning, the trial court concluded that Sowada could remain on the jury. We see no reason to disturb this conclusion.

█ Likewise, the postconviction court below did not abuse its discretion in determining that the private investigator's reports do not establish actual prejudice. To find that Sowada lied about knowing which party her sister supported, it would be necessary to accept the investigator's report over Sowada's testimony given and recorded at the time of trial. Even if we were to do so, Sowada consistently reiterated to the investigator and to her sister that the verdict was based on the evidence and the law. Consequently, nothing in the record indicates that the postconviction court erred in concluding that "the evidence does not reasonably suggest that any misconduct occurred" and that trial counsel did not provide ineffective assistance by declining to seek Sowada's removal.

█ We next turn to Boitnott's argument that trial counsel's withdrawal of the change of venue motion was the result of his lack of preparation. He cites the deposition taken during Boitnott's malpractice suit to show that counsel remembered only one article about Boitnott's case in the newspapers, knew Boitnott felt a fair trial was impossible in Benton County, and admitted with regard to the survey of county residents, "Those people indicated that they had made a decision as to whether [Boitnott] was guilty* * *." Trial counsel also agreed that the case may have been "high publicity" in Benton County.

To show that counsel's decision to withdraw the change of venue motion was objectively unreasonable, Boitnott takes many of his trial counsel's comments out of context. Counsel acknowledged that he filed the motion at Boitnott's request, but withdrew it upon finding "there was no merit to the Motion." Counsel also acknowledged that some people believed Boitnott was guilty, but believed that, as a whole, the situation in the county did not warrant pursuing a change of venue:

A. All the information that we had was that most of the people did not recall * * * it happening, or did not recall significant enough facts of the case in which to form an opinion as to whether he was guilty * * *.

Q. But based on the affidavits [of the surveyed people] that you just looked at, were those affidavits indicative to you that it was not a prejudicial community?

A. No, they were not indicative of the entire study that we had had.

Q. No. But I mean were those affidavits that I just handed to you, did they indicate that it was a prejudicial place to try the case?

A. That's what those people said. Those people indicated that they had made a decision as to whether or not he was guilty or not.

■ Boitnott's arguments also do not prove that pretrial publicity "affect[ed] the minds of the specific jurors involved in the case" so as to warrant a new trial in a different jurisdiction. *State v. Fratzke,* 354 N.W.2d 402, 406 (Minn.1984). "[E]xposure of some jurors to news reports before trial does not mean that the jury was biased." *State v. Salas,* 306 N.W.2d 832, 836 (Minn.1981). The survey question Boitnott cites involved only six community members, two of whom, according to Boitnott, said that 50 percent or less of their acquaintances believed that Boitnott was guilty.[10] Thus, the record does not contradict the strong presumption that counsel's decision to withdraw the change of venue motion was objectively reasonable and did not affect the trial's outcome.

■ Boitnott lastly alleges that he received ineffective assistance of appellate counsel on direct appeal "as a basis for not advancing the [ineffective assistance of trial counsel] claims herein." As the district court below held, Boitnott's ineffective assistance of appellate counsel claim fails because his underlying ineffective assistance of trial counsel claims have no merit. *See Sullivan v. State,* 585 N.W.2d 782, 785 (Minn.1998). Furthermore, Boitnott does not explain why it was unreasonable for his appellate counsel to raise some issues but not others. *See Wilson v. State,* 582 N.W.2d 882, 885 (Minn.1998). ("[C]ounsel

appealing a criminal conviction has no duty to raise all possible issues."). Accordingly, Boitnott does not overcome the "strong presumption" that appellate counsel's performance fell within "the wide range of 'reasonable professional assistance.' " *Id.* at 885 (quoting *Jones,* 392 N.W.2d at 236).

In summary, none of the grounds stated in Boitnott's postconviction petition or in his brief on appeal state facts that, if proven, would warrant postconviction relief. We therefore affirm the decisions of the postconviction court.

Affirmed.

GILBERT, J., took no part in the consideration or decision of this case.

---

**10.** We have already rejected the allegation that Sowada actually was biased and therefore need not address Boitnott's argument

that her alleged bias proves that a change of venue was necessary.