STATE of Minnesota, Respondent,

v.

James Evans JOHNSON, Appellant.

No. A04–385.

Supreme Court of Minnesota.

June 29, 2006.

Rehearing Denied Aug. 21, 2006.

Sara L. Martin, Assistant State Public Defender, Minneapolis, MN, for appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

MEYER, Justice.

A Hennepin County jury found appellant James Evans Johnson guilty of second-degree intentional murder for the shooting death of his girlfriend, Jullie Bottema. Johnson appealed his conviction to the court of appeals, arguing that the district court abused its discretion when it refused his request to instruct the jury on the lesser-included offense of first-degree heat-of-passion manslaughter and on self-defense. The court of appeals affirmed, holding that the evidence failed to support either instruction. We reverse and remand for a new trial.

Bottema was shot and killed on May 12, 2003, while in the upstairs bedroom of Johnson's home. The medical examiner testified that the manner of death was homicide. Bottema died instantly from a single gunshot wound to the top of her head. The shot was fired from a distance of approximately two to four feet and tore away a portion of Bottema's little finger as she crouched with her hands over her head. The Derringer pistol used to kill Bottema was found in her hand.

The state's theory is that Johnson killed Bottema and then shot himself to make it look like he did not intentionally kill her. Johnson, however, testified that Bottema shot him first and that he does not remember what happened after she shot him. Johnson did not deny that he shot Bottema, but claims that he acted either in the heat of passion or in self-defense.

Johnson and Bottema became romantically involved in early 2002. At the time of her death in May 2003, Bottema was intermittently living with her mother in Farmington, Minnesota, and Johnson in south Minneapolis.

On the evening of May 11, 2003, Johnson was cooking dinner for Bottema when his brother-in-law, Peter Jaroscak, arrived at Johnson's house. While Jaroscak was there, Johnson had a telephone conversation with Bottema in which Johnson learned that Bottema was not going to be home for dinner. Jaroscak testified he thought that Johnson "felt bad" and "dis-

appointed" but not angry about Bottema's cancellation. During the conversation, Bottema did not tell Johnson that she was mad or that she intended to leave him. Nevertheless, before Jaroscak left Johnson's home at approximately 11 p.m., Johnson e-mailed Jaroscak a semi-naked picture of Bottema in, as described by Jaroscak, "a lewd pose."

Johnson attempted to contact Bottema on her cell phone over 60 times from the time that Jaroscak left that evening until noon of the following day. Bottema's mother testified that Bottema finally answered Johnson's call at approximately noon the following day and "was mad, very mad." Bottema "was screaming on the phone," asking Johnson, "How could you do this to me, Jim? Why did you do this to me?" The cell phone call lasted approximately a half hour.

Later in the afternoon, Bottema called her brother's best friend, Robert Horton. Horton testified that Bottema was upset and she told him "that she had enough, and it was time for her to move out and that [Johnson] put a picture of her on the internet." They then drove to Johnson's house. Not finding Johnson there, they found his vehicle parked nearby at the house of Johnson's friend, John White. Bottema called Johnson on his cell phone, and he immediately left White's house to go home.

White said that by the time Johnson left White's house, Johnson had consumed four or five rum and Coke drinks. Johnson's blood-alcohol level was .188 when it was tested at 6:24 p.m. White, a licensed firearms dealer, had previously sold Johnson a two-shot Derringer pistol that he never saw Johnson carry.

Bottema and Horton waited for Johnson to arrive at his house at which point Bottema walked into the house, showed Johnson the picture of her that Johnson had e-mailed to Jaroscak, and asked him, "What is this? Why did you put this on the internet?" Johnson described her as "crazy mad" at this point. She then went upstairs to her bedroom and started packing her things. The autopsy of Bottema indicated that she had a very large amount of methamphetamine in her system at the time of her death.

Johnson followed her upstairs and asked, "Why are you doing this to me? Why do you want to leave?" At some point, Johnson noticed that his Derringer, which he had taken out the night before while investigating a noise, was still on his computer table on the main level of his house. He decided to put it in his pocket because Bottema was getting angry, he did not know Horton, and he wanted to be safe. Eventually, Johnson came back downstairs and went with Horton out the back door to show him a table saw that had originally been intended for Bottema's father. Johnson told Horton that if Bottema's father did not want it, Horton could take it.

Johnson testified that he then went back upstairs because he "wanted to see what she was packing because that was my mother's room." Johnson's mother had recently died and her belongings were in the upstairs bedroom. Bottema told him "to get out of there." Johnson left the room and when he came back he thought she seemed "excited" and "different" and that he had "never seen her like that" and "she wouldn't listen to nothing." He "wanted her to slow down on the drugs" and told her that he might call the police. He looked to see what Bottema was packing. She pushed him away a few times and then Johnson "told her not to push" him. Johnson said that she "just went nutso like a light switch" and started hitting and kicking him, making him fall

down. He thought that the Derringer fell out of his pocket when he fell down.

According to Johnson, he got up, told Bottema that he "was going to call the cops and let them straighten this up, they could watch what she's packing," and started to leave the room. He then looked back and saw that she was pointing the gun at him. When he turned towards her and pushed the gun away, it fired and he was hit. His next memory is of waking up on the floor of the bedroom lying next to Bottema's body. He heard sirens approaching and went out to the front porch to tell the officers that they needed help. Johnson did not remember whether or not he shot Bottema.

Horton testified that he came back into the house after spending between three and five minutes moving the table saw to the alley. He heard Johnson and Bottema talking and arguing and was in the house for two or three seconds when he heard a gunshot. Horton then saw Johnson backing out of the bedroom doorway with the gun in his hand. Horton testified that Johnson turned and looked at him, with a look of disbelief or shock on his face. Horton then headed out the front door and called 911 on his cell phone. As he was leaving the house, he heard a second gunshot.

Minneapolis Police Officer Virginia Staudt responded to Horton's call between 5:00 and 5:30 p.m. She saw Johnson coming out of the house a few minutes after she arrived at the Johnson home. As Johnson came out of the house, he saw Staudt and said, "We need help." Staudt ordered Johnson to lie down on the sidewalk, where she frisked him and took a Derringer holster from his right front pants pocket. Johnson then told Staudt that Bottema "grabbed my little Derringer and shot me. I pushed her back, she cocked it again and it went off."

Staudt observed that Johnson had an injury near the right side of his head and described his demeanor as very calm. She then accompanied Johnson in an ambulance to the hospital where she learned that Johnson had a gunshot wound to his head. Staudt heard Johnson tell the ambulance paramedic that Bottema "shot me and then I tried to take the gun from her and it went off." The emergency room physician who treated Johnson's head wound believed he was shot from close range because of the presence of powder burns around the wound.

At trial, Johnson repeatedly claimed that he did not remember how Bottema was shot. He did not believe that he shot Bottema, but admitted that it was possible. The medical examiner testified that Bottema could not have shot herself because her hands were on top of her head when the fatal shot was fired.

During trial, Johnson was described as a "calming," "very mellow," "laid back," and "compassionate" man who had never been in trouble with the law. Two people who knew Johnson for at least 40 years, his sister Gloria Frandsen and his friend John White, never knew him to be violent. In a prior romantic relationship, which lasted approximately 20 years, there were no allegations of violent or assaultive behavior. White, who talked with Johnson almost every day, said that Johnson "talked highly of [Bottema] all the time." Johnson's sister thought that "never in a million years" would he be capable of hurting Bottema.

After closing testimony and prior to closing arguments, Johnson requested an instruction on the lesser-included offense of first-degree heat-of-passion manslaughter. He also requested a self-defense instruction. The district court denied each of Johnson's requests. He now argues

that because his requests were denied, he was not allowed to present his theory of the case to the jury.

In its closing argument, the state told the jury "the evidence is overwhelming the defendant did in fact kill Jullie Bottema." The state then explained how the evidence supported the finding that Bottema was killed by a single gunshot wound to the top of the head while she was "cowering for her life." The state then argued that Johnson, after seeing Horton at the bottom of the stairs, was "thinking fast" and shot "himself at the edge of his head." After shooting himself, the state argued, Johnson then put the gun into Bottema's hand to make it look like she had shot herself. After noting that it did not have to prove why Johnson killed Bottema, the state argued that Johnson loved Bottema and did not "want to lose her." The state further argued:

> [T]here's nothing wrong with that, but when she had had enough and was mad at him and was moving out and that's it, maybe that's *why he snapped,* maybe that's why either, you know, if I can't have you, no one else can or, you know, *he just snapped,* who knows why, but that certainly would be an explanation.

(Emphasis added.) The remainder of the state's closing argument focused largely on discrediting Johnson's testimony, and in particular arguing that Bottema was shot first.

The jury was given two verdict forms, one finding Johnson guilty of murder in the second degree and the other finding him not guilty of murder in the second degree. After deliberating for approximately four hours, the jury returned a verdict of guilty on the sole count charged. Johnson was sentenced to the presumptive executed term of 306 months. The court of appeals affirmed Johnson's conviction.

*State v. Johnson,* No. A04–385, 2005 WL 623248 (Minn.App. Mar.15, 2005).

## I.

**■■■** We first consider whether the district court erred in denying Johnson's request for a jury instruction on the lesser-included offense of first-degree heat-of-passion manslaughter. We review the denial of a defendant's request for a lesser-included offense instruction under an abuse of discretion standard. *State v. Dahlin,* 695 N.W.2d 588, 597 (Minn.2005). When a defendant requests that a lesser-included offense instruction be given to the jury, the trial court must give the "instruction when 1) the lesser offense is included in the charged offense; 2) the evidence provides a rational basis for acquitting the defendant of the offense charged; and 3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense." Id. at 598. Additionally, "trial courts must look at the evidence in the light most favorable to the party requesting the instruction when determining whether a lesser-included offense instruction is warranted." Id. "[W]hen evidence exists to support the giving of the instruction, it is an abuse of discretion for a trial court judge to weigh the evidence or discredit witnesses and thereby deny an instruction." Id. When we determine that a trial court abused its discretion by failing to give a requested lesser-included offense instruction, we reverse the verdict "only if the defendant is prejudiced thereby." Id.

**■■■** Minnesota Statutes § 609.04, subd. 1 (2004), provides that a lesser degree of the crime charged is an "included offense." In *State v. Leinweber,* we determined that first-degree heat-of-passion manslaughter was a lesser-included offense of second-degree intentional murder—the crime charged. 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975). Identically, Johnson ar-

gues here that heat-of-passion manslaughter is included in the charged offense of second-degree intentional murder. We agree and conclude that Johnson meets the first requirement for submission of his requested jury instruction on heat-of-passion manslaughter.

■ We next consider whether Johnson could have been acquitted of second-degree intentional murder but convicted of first-degree heat-of-passion manslaughter.

> An intentional killing may be mitigated to first degree manslaughter if two elements are present: (1) the killing must be done in the heat of passion, and (2) the passion must have been provoked by words and acts of another such as would provoke a person of ordinary self-control under the circumstances.

*State v. Kelly,* 435 N.W.2d 807, 812 (Minn. 1989). Our inquiry hinges on whether there was a rational basis for a jury to conclude that both elements of the heat-of-passion defense were present. Analyzing the first element of heat of passion, we have said:

> The first element of the heat of passion defense is subjective: whether the killing was actually committed in the heat of passion. The defendant's emotional state at the time of the killing is of primary importance in making this determination. In determining whether the district court erred in denying the instruction we look for a heat of passion that clouds a defendant's reason and weakens his willpower. Anger alone is not enough. A defendant's behavior before, during and after the crime is relevant to whether the crime was committed in the heat of passion.

*State v. Carney,* 649 N.W.2d 455, 461 (Minn.2002) (citations omitted).

■ Johnson argues that his "emotional state was consistent with heat of passion" and suggests that he experienced "fear, terror, fright, and anger" because Bottema was "crazy mad," "went nutso like a light switch," pushed him away when he attempted to ensure that Bottema was not taking items that used to belong to his recently deceased mother, and then kicked him and shot him. The state argues that there was no rational basis for the jury to conclude that Johnson killed Bottema in the heat of passion because Johnson continued to have rational thought before, during, and after the murder. It cites a significant amount of evidence that either directly or inferentially supports its characterization of Johnson's emotional state before and after the murder.

The court of appeals stated the following about Johnson's emotional state before, during, and after the shooting:

> Neither appellant nor any of the witnesses who saw him before or after the murder testified that he appeared angry or upset, or that his behavior was otherwise unusual. By all accounts and by his own admissions, appellant was not angry and remained calm throughout the incident. The evidence thus fails to support appellant's claim that he acted in the heat of passion.

*Johnson,* 2005 WL 623248, at *2. The court apparently focused on the testimony of Staudt, the first person to see Johnson after the shooting (arriving approximately five to ten minutes later), who described Johnson's demeanor as "very calm." In addition, the emergency room physician who treated Johnson approximately one hour after the shooting described him as "awake" and "alert" and stated that he had a "normal neurological exam."

Although the court of appeals' conclusion that Johnson was not angry and remained calm before and after the shooting finds strong support in the record, we have made it clear that "[t]he defendant's emo-

tional state *at the time of the killing* is of primary importance" in determining the first element of manslaughter. *Carney,* 649 N.W.2d at 461 (emphasis added). There is very little direct evidence of Johnson's emotional state from the time he left Horton on the back porch to the time, approximately ten minutes later, when Johnson walked out of the house and said to Staudt, "We need help." But, some of the evidence of Johnson's emotional state at the time of the shooting supports Johnson's claim that he acted in the heat of passion, particularly when evaluated in the light most favorable to Johnson.

There was evidence in the record to support the following version of what happened at the time of the shooting: Johnson and Bottema had an argument. Bottema got "pissed" and "big time mad." Johnson then got angry and threatened to call the cops on her. Bottema then pushed Johnson, "went nutso like a light switch," and started hitting Johnson and kicked him to the ground. Johnson got up and threatened again to call the cops. Johnson was then shot while struggling for the gun.

Horton's testimony that he heard Johnson and Bottema arguing seconds before he heard the first shot corroborates this version of events. Additionally, Horton testified that after that first shot, Johnson had a look of "disbelief" or "shock" on his face.[1] Such a look is consistent with someone whose reason was clouded or willpower weakened. Such a look could also be consistent with the description of John-

son's subsequent demeanor as being "very calm." Viewing the evidence in the light most favorable to Johnson, a rational jury could have made a reasonable inference that Johnson's reasoning was clouded and his willpower weakened at the time of the shooting and therefore acted in the heat of passion.[2]

■ The second element of the heat-of-passion defense is objective, analyzing whether "the passion was provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances." *State v. Brocks,* 587 N.W.2d 37, 41 (Minn.1998). Johnson argues that he was provoked when he was repeatedly hit, kicked, and shot. The state argues that "even if [Bottema] had kicked and/or hit the armed [Johnson, that] is not the type of conduct that would provoke a person of ordinary self-control to murder." The court of appeals determined that "[t]he physical evidence and the testimony of [Horton] * * * contradict [Johnson's] claim that the victim provoked him by firing the gun and shooting him before she was fatally shot." *Johnson,* 2005 WL 623248, at *2–3.

In *State v. Shannon,* under a "plain error" standard, this court reversed and remanded a conviction for second-degree intentional murder in part because the district court failed to, sua sponte, correct the prosecutor's misleading characterization of the instructed heat-of-passion charge. 514 N.W.2d 790, 793 (Minn.1994). In *Shan-*

---

**1.** Horton was never asked if he saw that Johnson had been shot, nor was he asked if Johnson said anything to him about being shot.

**2.** The dissent asserts that Johnson admitted that he "was not angry and remained calm throughout the incident." Johnson does *not* admit either that he was not angry or that he remained calm *throughout* the incident. He was never asked those questions. He said

"no" when asked questions like: "Did you attempt to hit her?" and "Did you say that you were going to physically harm her at all?" After testifying that Bottema kicked him in the knee, Johnson was asked: "At this point did you threaten her?" Johnson replied, "Yes. I got up and told her I was going to call the cops and let them straighten this up, they could watch what she's packing."

*non*, the defendant and his victim, a girlfriend,

> got involved in a domestic dispute while under the influence of both [alcohol and crack cocaine]. The victim repeatedly turned up the volume on defendant's stereo, and he kept turning it down because he did not want her to ruin his equipment and he did not want a neighbor to call the police. The dispute escalated to a physical altercation in which apparently both the victim and defendant participated * * *. Defendant claimed in his testimony that his memory was hazy and that he was not exactly sure what he did. He did not think he choked the victim to death during the dispute but he admitted that he might have done so. We believe that this is the kind of case in which it is appropriate to submit heat of passion manslaughter * * *.

*Id.*

Johnson's case is analogous to *Shannon*. Indeed, the victim's alleged actions in this case are more provocative than the victim's actions in *Shannon*, in that here the victim is alleged to have provoked the defendant by shooting him. The state attempts to distinguish *Shannon* by arguing that, in that case, "there was rational, credible evidence of a 'physical altercation in which apparently both the victim and defendant participated.'" The court of appeals looked at all of the evidence in this case and determined that "[t]he only rational inferences that can be drawn from this evidence is that appellant shot the victim, shot himself, and then either placed or dropped the gun in her hand."[3] *Johnson*, 2005 WL 623248, at *2. But *Dahlin* makes it clear that only the jury determines what evidence is credible and what reasonable inferences can be drawn from that evidence, not the district court. 695 N.W.2d at 598. Therefore, we conclude that a jury viewing all of the evidence in the record could determine that Johnson engaged in an increasingly heated argument with Bottema that escalated to a physical altercation in which Bottema shot Johnson—provoking Johnson to shoot her back just seconds later. There is evidence to support Johnson's claim that he acted in the heat of passion when he shot Bottema and that her actions were sufficiently provocative to "provoke a person of ordinary self-control under like circumstances." *Kelly*, 435 N.W.2d at 812. Under the *Dahlin* standard, it was an abuse of discretion to deny Johnson's request for a jury instruction on the lesser-included charge of first-degree heat-of-passion manslaughter.[4]

**3.** In its brief to both this court and to the court of appeals, the state argued:

> Ms. Bottema had stippling on both hands, indicating "[v]ery clearly there is no way she could have shot the gun and got the stippling on the back of her fingers. It's impossible"; the fact that no stippling was present on the palm of Ms. Bottema's hand indicated that her "palm surface was not directed toward the barrel of the gun"; it is impossible for Ms. Bottema to have gotten the amount of stippling that she had on her hands if she had been holding a gun.

(Purporting to quote the medical examiner, citing trial transcript pages 400–01.) In addition to the first quoted material not being in the transcript on the pages cited, the state appears to be arguing that there was medical testimony indicating that Bottema could not have shot the gun *at all*. However, the context of the medical examiner's testimony is clearly directed to the question of whether the *fatal* gunshot could have been fired by Bottema (i.e., suicide), not whether she may have shot Johnson before she was fatally wounded by someone else. Both the court of appeals and the dissent mistakenly understand the medical examiner to have testified that Bottema could not have shot the gun. This is clearly incorrect. At oral argument, the state clarified that it was not arguing that Bottema could not have shot the gun.

**4.** The dissent appears to be ignoring the *Dahlin* requirement that judges are not to weigh

 After determining that the district court abused its discretion in denying Johnson's requested instruction, we "must proceed to an analysis of whether the defendant was prejudiced by the trial court's failure to give it." *Dahlin*, 695 N.W.2d at 599. "[W]hen determining if a defendant has been prejudiced by the court's failure to give a requested lesser-included offense instruction, appellate courts should consider the instructions actually given and the verdict rendered by the jury." Id.

The difference between the presumptive sentence for second-degree intentional murder and first-degree heat-of-passion manslaughter is 224 months, or more than 18 years. As there was a rational basis for a jury to acquit Johnson of second-degree murder and convict him of heat-of-passion manslaughter, the denial of the instruction request was prejudicial. *See id.* at 600 (determining trial court's abuse of discretion in denying request for instruction on second-degree intentional murder was prejudicial when jury was left with choice of convicting on first-degree murder or acquitting defendant). Although there are circumstances in which an abuse of discretion in denying a requested jury instruction would not be prejudicial, those circumstances are not present here. *See id.* at 599.

## II.

 We next consider whether the district court erred in denying Johnson's request for a self-defense instruction. Determining whether a jury instruction should be given "lies within the discretion of the district court and will not be reversed but for an abuse of that discretion." *State v. Hannon*, 703 N.W.2d 498, 509 (Minn.2005). It is an abuse of the district

court's discretion to refuse to give an instruction on the defendant's theory of the case "if there is evidence to support it." *State v. Kuhnau*, 622 N.W.2d 552, 557 (Minn.2001). But, "[i]f the defense was not prejudiced by a refusal to issue an instruction, there is no reversible error." *Hannon*, 703 N.W.2d at 509 (citing *Kuhnau*, 622 N.W.2d at 555).

 The defendant "has the burden of going forward with evidence to support a claim of self-defense." *State v. Basting*, 572 N.W.2d 281, 286 (Minn.1997). Once the defendant has met that burden, "the state has the burden of disproving one or more of these elements beyond a reasonable doubt." Id.

> The elements of self-defense are (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he or she was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

Id. at 285. In Johnson's case, the fourth element does not apply because there is no duty to retreat in one's own home. *State v. Glowacki*, 630 N.W.2d 392, 402 (Minn. 2001).

We begin our analysis by considering whether Johnson came forward with enough evidence to support his claim of self-defense. In particular, we consider whether Johnson produced reasonable evidence to support his claim and, if so, whether such evidence was sufficient to shift the burden to the state to disprove the elements beyond a reasonable doubt. *State v. Boitnott*, 443 N.W.2d 527, 532 (Minn.1989) (stating that "[t]he process of

---

the evidence or determine credibility when it states that Johnson "failed to present plausible evidence" and that "Johnson's story is

simply not credible." Johnson's jury was required to reach such conclusions, not a judge.

going forward with evidence is complete when the defendant submits reasonable evidence"); *Bellcourt v. State*, 390 N.W.2d 269, 272–73 (Minn.1986) (determining that there was *no* evidence that defendant, who was the original aggressor, had clearly manifested the good-faith intention to withdraw required when seeking a self-defense instruction); *State v. Graham*, 371 N.W.2d 204, 209 (Minn.1985) (determining that one element of self-defense argument was "not supported with *any* evidence") (emphasis added).

Johnson argues that his proffered evidence meets his burden because it tends to show that he was not the original aggressor in the incident, and that after Bottema shot him, he had an actual, honest, and reasonable belief that he was in imminent danger of great bodily harm or death. The state argues that other evidence conflicts with Johnson's testimony, and that he "was clearly the aggressor in this case," and that he had no actual, honest, or reasonable belief that he was in imminent danger of great bodily harm or death. Additionally, the state argues that Johnson "clearly used unreasonable force" because Bottema was unarmed when Johnson shot her in the top of her head.

■ We find Johnson's argument persuasive. There is evidence to support Johnson's claim that Bottema was the aggressor in this case when she pushed and repeatedly hit Johnson, and then kicked and shot him. The physical evidence is not inconsistent with his defense. He therefore has met his burden on the first element of a self-defense claim.

■ The second element of a self-defense claim is that the defendant has an actual and honest belief that he or she was in imminent danger of death or great bodily harm. Although no Minnesota case appears to explicitly state so, it is self-evident that this element of the self-defense claim is subjective and depends upon the defendant's state of mind. *See State v. Sims*, 262 Kan. 165, 936 P.2d 779, 784 (1997) (describing element as "the subjective component of self-defense"); *Hilbert v. Commonwealth*, 162 S.W.3d 921, 924 (Ky.2005) (stating that " 'the focus of the penal code is on the defendant's actual subjective belief in the need for self-protection' " quoting *Elliott v. Commonwealth*, 976 S.W.2d 416, 419 (Ky.1998)); *Commonwealth v. Toon*, 55 Mass.App.Ct. 642, 773 N.E.2d 993, 1002 (2002) (stating that element "looks to the defendant's subjective state of mind"). At Johnson's trial, the district court denied Johnson's request for a self-defense instruction because "there [was] no testimony here regarding the belief of the defendant that he had to kill her in self-defense." Johnson argued that there did not have to be direct testimony as to his state of mind; the jury should be allowed to infer from the circumstantial evidence that he believed he had to kill Bottema in self-defense.

■ We do not adopt the restrictive view that a defendant must testify and provide direct evidence of his or her state of mind in order to be entitled to an instruction on self-defense. We believe that a self-defense instruction may be warranted when the evidence on self-defense is entirely circumstantial. *See People v. Hoskins*, 403 Mich. 95, 267 N.W.2d 417, 419 (1978) (holding that "[a] defendant need not take the stand and testify in order to merit an instruction on self-defense" and "a defendant may show his state of mind by circumstantial evidence"); *Hilbert*, 162 S.W.3d at 924 (holding that a defendant need not testify in order to receive an instruction on self-defense). We have said that "[i]ntent is a state of mind and is, therefore, generally provable only by inferences drawn from a person's words or actions in light of all the surrounding

circumstances." *Boitnott*, 443 N.W.2d at 531. Similarly, a defendant's state of mind with respect to an actual and honest belief that he or she was in imminent danger of death or great bodily harm may be established circumstantially. It would be inconsistent with a defendant's right to the presumption of innocence if we determined that a defendant can be found guilty of a crime based on inferences but must provide direct testimony in order to be found not guilty. *See Bernhardt v. State*, 684 N.W.2d 465, 477 (Minn.2004) ("Circumstantial evidence is entitled to the same weight as direct evidence; however, if a conviction is based on circumstantial evidence, a *higher* level of scrutiny is warranted.") (emphasis added).

Johnson did not directly testify that he believed he was in imminent danger of death or great bodily harm. He did testify that after Bottema had kicked him to the floor, he got up, threatened to call the cops, and started walking out of the bedroom. Bottema, who had just gone "nutso like a light switch," then pointed the gun at him. Johnson then tried to push the gun away, the gun fired, and he was hit. At this point in the incident, it appears reasonable to infer that Johnson had an actual and honest belief that he was in imminent danger. In *Hilbert*, the Kentucky Supreme Court found the evidence of the defendant's belief sufficient to compel the self-defense instruction based largely on the defendant's police statement that there was an "altercation" between him and the victim and the presence of "a welt" on the defendant's head that may have been attributable to the altercation. 162 S.W.3d at 925.

We acknowledge that determining whether Johnson met his burden on this element is a close call, but we have made clear that "[i]n keeping with the presumption of innocence, trial courts should re-solve all doubts as to the legitimacy of a self-defense claim in favor of the defendant." *Boitnott*, 443 N.W.2d at 533 n. 2. Both the court of appeals and the state rely upon evidence that supports a version of events in which Johnson shot Bottema first and then shot himself. *Johnson*, 2005 WL 623248, at *2–3. That evidence may, in the court of appeals' words, "overwhelmingly establish" that Johnson did not act in self-defense. *Johnson*, 2005 WL 623248, at *3. But that evidence contradicts other evidence that supports Johnson's claim. As it is the jury's duty to determine what evidence is credible, we conclude that Johnson has met his burden on the second element of self-defense.

■■■■■ The third element of a self-defense claim is the existence of reasonable grounds for the defendant's belief that the danger of death or great bodily harm is imminent. This is an objective test. *See State v. Boyce*, 284 Minn. 242, 256, 170 N.W.2d 104, 113 (1969) (evaluating defendant's belief to determine whether "the ordinary reasonable person would consider killing necessary to avert the danger of death or grievous bodily harm"); *see also State v. Clark*, 264 Conn. 723, 826 A.2d 128, 134–35 (2003) (describing the difference between subjective and objective elements of self-defense). The court assesses whether the killing was necessary, "in light of the danger to be apprehended," to avert serious injury. *State v. Austin*, 332 N.W.2d 21, 24 (Minn.1983).

As discussed *supra*, we resolve all doubts in Johnson's favor. He testified that Bottema went "nutso" and pointed a gun at him, ultimately causing his head wound. We held *supra* that a rational jury could credit Johnson's story that Bottema shot him in the head and that a struggle then ensued for the gun. A reasonable person would have grounds to believe that Bottema was going to shoot

again and would consider shooting necessary to avert the danger of death or grievous bodily harm. Therefore, the evidence satisfies the third element of the self-defense instruction.

Johnson met his burden of coming forward with evidence to support each element of his claim of self-defense. We hold that it was an abuse of the district court's discretion to deny his request for an instruction on this claim. In *Dahlin*, this court determined that the defense was prejudiced by the trial court's refusal to provide a lesser-included offense instruction:

> By not giving the lesser-included offense instruction of second-degree intentional murder, the trial court forced the jury to choose between convicting Dahlin of premeditated murder and acquitting him of a crime for which the evidence clearly suggested he was responsible—at least to some degree. Such either-or framing of guilt or innocence is appropriate only in exceptional cases.

695 N.W.2d at 601. Johnson's case is not one of those "exceptional cases." *Id.* The refusal to provide the heat-of-passion and self-defense instructions provided the jury with no option other than guilt. Without the requested instructions, a jury following the law would have been required to return a guilty verdict even if it believed that Johnson was acting in the heat of passion or in self-defense. Therefore, we conclude that the errors were prejudicial and Johnson is entitled to a new trial.

Reversed and remanded for a new trial.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. Appellant James Evans Johnson asserts that he was entitled to an instruction on the lesser-included offense of first-degree (heat-of-passion) manslaughter. I disagree.

We review the denial of a defendant's request for a lesser-included offense instruction under an abuse of discretion standard. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn.2005). The district court is required to submit lesser-included offense instructions when "(1) the lesser offense is included in the charged offense; (2) the evidence provides a rational basis for acquitting the defendant of the offense charged; and (3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense." Id. at 598. My analysis focuses on this third factor. A rational basis exists to convict of first-degree (heat-of-passion) manslaughter if there is sufficient evidence presented to find (1) the defendant killed his victim in the heat of passion; and (2) the defendant's passion was provoked by words or acts that would provoke a person of ordinary self-control under similar circumstances. *See State v. Brocks*, 587 N.W.2d 37, 41 (Minn.1998).

While under the foregoing criteria the question in this case is close, I come to the conclusion that the court of appeals was correct when it held that the district court did not abuse its discretion when it denied Johnson's request for the heat-of-passion manslaughter instruction. Johnson asserts on appeal that his emotional state was consistent with heat of passion. But as the majority correctly states, there is "very little direct evidence of Johnson's emotional state" at the time of the shooting. The record shows that Johnson and the victim, Jullie Bottema, were engaged in an argument and that *Bottema* was

upset, even "very mad" at Johnson because he had e-mailed an inappropriate photograph of her to his brother-in-law. But the testimony of the defendant, the physical evidence, and other circumstances of the shooting do not justify the majority's conclusion that there was a rational basis to convict Johnson of heat-of-passion manslaughter.

Neither Johnson nor any of the witnesses who saw him before or after the shooting testified that he appeared angry or that his behavior was otherwise consistent with being provoked. By all accounts—including Johnson's own testimony—Johnson was not angry at the time of the shooting. Horton did testify that Johnson had a look of "disbelief" or "shock" on his face when he backed out of the bedroom doorway with a gun in his hand after the first gunshot was fired. But Horton's description of Johnson is not unexpected for someone who had just shot another person, and is not probative of anger or provocation and is not enough to support a heat-of-passion instruction—especially in the context of the other direct evidence in this case.

Johnson testified that, while arguing with Bottema, she somehow gained possession of the gun, pointed it at him, and as he turned toward her to push the gun away, it fired and he was hit. If this version of the facts was at all plausible, Bottema would have had to shoot Johnson first, before she was shot, as Bottema's wound tore out the back of her head, was fatal, and could not have been self-inflicted. This sequence of events indicates that Bottema was shot before Johnson was shot, which leads inevitably to the conclusion that the second shot was a self-inflicted wound to Johnson's head. Moreover, this conclusion is supported by Horton's testimony that, as he was leaving the house, he heard a second gunshot. Johnson's story is simply not credible.[5] Moreover, if Johnson shot himself, then he was not provoked by Bottema shooting him and a critical basis for the heat-of-passion instruction disappears.

As the court of appeals said:

The physical evidence and the testimony of [Horton] who was standing at the bottom of the stairs, however, contradict [Johnson's] claim that the victim provoked him by firing the gun and shooting him before she was fatally shot. In particular, that evidence shows that (1) the victim had no stippling on her palms that would indicate that she fired the gun;[6] (2) according to the forensic evidence, the victim was shot at close range from above in the back of her head, while she was crouching or sitting with her hands covering her head; (3) after

---

5. While *Dahlin* cautions judges not to weigh the evidence or assess the credibility of witnesses, it does not require a judge to accept a version of the facts that stretches credulity to the limits when determining whether a lesser-included offense jury instruction is warranted. *See Dahlin*, 695 N.W.2d at 598 (stating a district court must determine whether evidence provides a rational basis for acquitting the defendant of the offense charged and convicting the defendant of the lesser-included offense).

6. At this point, I must note that I am perplexed by the majority's footnote 3, specifically the majority's extensive use of a quote from the state's brief. The dissent does not rely on that particular argument made by the state, and thus the majority's citation to this language takes on the aspect of a red herring—"something used to disguise a trail or an event in order to throw searchers off the track; a diversionary issue." James Rogers, *The Dictionary of Clichés* 216 (Wings Books 1992). The medical examiner's testimony is what it is—no more, no less. The medical examiner did not testify that it was impossible for Bottema to have shot the gun, only that there was no forensic evidence that she did shoot the gun.

the first shot, [Horton] standing at the bottom of the stairs saw [Johnson] back out of the upstairs bedroom with a gun in his hand; (4) [Horton] heard a second shot as he was leaving the house to call 911; (5) several minutes later, [Johnson] came out of the house with a gunshot wound to the side of his head; and (6) the victim was found in the upstairs bedroom with the gun in her hand.

*State v. Johnson,* No. A04–385, 2005 WL 623248, at *1, 2–3 (Minn.App. Mar.15, 2005).

Even when looking at this evidence under the "light most favorable" standard that we recently articulated in *Dahlin,* Johnson's claim that he was entitled to a heat-of-passion manslaughter instruction falls short because he failed to present plausible evidence [7] that Bottema shot him first or otherwise provoked him. *Dahlin,* 695 N.W.2d at 598. Therefore, I conclude that when the district court denied Johnson's requested instruction, it did not abuse its discretion. The court did not need to weigh the evidence or discredit witnesses; rather, it acted within the proper purview of its discretion when it concluded that even Johnson's self-serving testimony failed to support findings of either provocation by Bottema or heat of passion on the part of Johnson.

For many of the same reasons, I also conclude that Johnson was not entitled to a self-defense instruction. The elements of self-defense are (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he was in imminent danger of death or great bodily harm; (3) existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat. *State v. Basting,* 572 N.W.2d 281, 285 (Minn.1997). A self-

defense instruction is required only if a defendant raises the defense by creating or raising a reasonable doubt that his use of force was justified. *See State v. Dodis,* 314 N.W.2d 233, 237 (Minn.1982).

Here, as the court of appeals correctly concluded, the problem with Johnson's assertion that he acted in self-defense is that the testimony of Horton and other witnesses, together with the physical evidence left at the scene, fails to provide any support for his version of the events. Rather, as the court of appeals stated:

> the evidence overwhelmingly establishes that [Johnson] was the aggressor and that his use of force was not reasonable: he brought the gun into the bedroom, shot the unarmed cowering victim at close range, and placed the gun in her hand.

*Johnson,* 2005 WL 623248, at *3.

For all of the foregoing reasons, I conclude that the district court did not abuse its discretion when it denied Johnson's request for a self-defense instruction. I would affirm.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

**7.** *See supra* note 1.