*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0362**

State of Minnesota,
Respondent,

vs.

Reginald Scott Hubbard,
Appellant.

**Filed February 26, 2024**
**Affirmed**
**Smith, Tracy M., Judge**

Yellow Medicine County District Court
File No. 87-CR-22-435

Keith Ellison, Attorney General, Lydia Villalva Lijó, Assistant Attorney General, St. Paul, Minnesota; and

Mark Gruenes, Yellow Medicine County Attorney, Granite Falls, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Leah C. Graf, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Wheelock, Presiding Judge; Smith, Tracy M., Judge; and Gaïtas, Judge.

**NONPRECEDENTIAL OPINION**

**SMITH, TRACY M.**, Judge

In this appeal from a final judgment of conviction following a jury trial, appellant Reginald Scott Hubbard argues that his conviction for felony fifth-degree assault must be

reversed and the case remanded for a new trial because the district court (1) erred by denying his request for a self-defense jury instruction and (2) violated his right to testify and present a complete defense by prohibiting him from explaining his mental state at the time of the offense. In his pro se supplemental brief, Hubbard also asserts ineffective assistance of counsel and mistreatment at the county jail. We conclude that Hubbard failed to meet his burden of production to warrant a self-defense instruction, that any error in excluding his testimony about his mental state was harmless beyond a reasonable doubt, and that the arguments in Hubbard's supplemental brief fail because they are unsupported by legal authority and citation to the record. We therefore affirm.

**FACTS**

The following facts are taken from the evidence presented at trial.

**The Assault**

On the morning of September 10, 2022, Hubbard and victim K.M. were in custody at the Yellow Medicine County Jail. Hubbard and K.M., along with a third inmate, were in the dayroom of their shared jail pod. Three individual cells—the doors of which were open—adjoined the dayroom. The dayroom was monitored by a camera, but the individual cells were not.

Initially, K.M. was sitting alone at a table, flipping through the channels on the dayroom's television. Hubbard approached K.M., picked up the television remote control from the table at which K.M. was sitting, and told K.M. that it was "football day." K.M. and Hubbard exchanged words before K.M. suddenly got up, stepped toward Hubbard, and took the remote control out of Hubbard's hand. K.M. continued to stand for approximately

2

30 seconds while Hubbard repeatedly asked K.M. to go into an individual cell with him. As K.M. was standing, he appeared to take a second step toward Hubbard.

Instead of following Hubbard into an individual cell, K.M. sat down again at the same table and faced the television. Hubbard remained standing and continued to repeatedly ask K.M. to go into an individual cell with him. K.M. remained seated and did not move. Hubbard testified that he did not want to fight K.M.—rather, he was asking K.M. to go to an individual cell because he wanted to see if K.M. "had something against [him]" and because he (Hubbard) was "scared" and "[p]aranoid."

Hubbard was moving around the dayroom while he talked to K.M. First, he walked into a cell on the opposite side of the room from K.M. as he asked K.M. to join him. Hubbard then moved to the cell behind where K.M. was sitting and asked K.M. to join him. Approximately 20 seconds later, Hubbard came out of that cell and moved back across the room from K.M. Hubbard continued to ask K.M. to go into a cell with him, and, after approximately 30 seconds, Hubbard lunged across the room at K.M., who was still sitting down. Hubbard put his arm around K.M.'s neck from behind and dragged K.M. out of his chair and into the individual cell behind where K.M. was sitting.

The time periods between these events were as follows: (1) there was approximately one minute and 40 seconds between when K.M. took the remote from Hubbard's hand and when Hubbard attacked K.M., (2) there was approximately one minute and 30 seconds between when K.M. took the second step toward Hubbard and when Hubbard attacked K.M., and (3) there was approximately one minute and seven seconds between when K.M. sat back down and when Hubbard attacked K.M.

3

A corrections officer observed the confrontation on camera. The officer entered the jail pod and, when he looked into one of the individual cells, saw Hubbard on his back with his arm around K.M.'s neck. K.M. testified that he recalled the officer coming into the cell but that he "was starting to black out at the time." K.M. also recalled that he felt like he was "going to die" and that he felt pain during the incident.

The officer told Hubbard to let go of K.M., but Hubbard did not immediately do so. Hubbard told the officer that K.M. had been threatening him. The officer stood Hubbard up, K.M. was finally released, and the two men were separated.

Hubbard testified that, leading up to the assault, he felt "overwhelmed" and "threatened" by K.M. He described K.M. as "pretty tall." Hubbard explained that he knew K.M. from being in a different jail pod with him a couple days prior to the assault. He testified that, on the day before the assault, K.M. asked him if he could use Hubbard's phone card. Hubbard testified that he could not let K.M. use his phone card because he was running low on funds. Hubbard explained that K.M. "couldn't understand it" and that he (Hubbard) got "locked down" because K.M. threatened him. Hubbard further testified that he tried to "neutralize the situation" and show K.M. that there were "no hard feelings" by sending K.M. cookies.

After the assault, respondent State of Minnesota charged Hubbard with one count of felony fifth-degree assault in violation of Minnesota Statutes section 609.224, subdivision 4(b) (2022). Before trial, Hubbard noticed his intent to rely on self-defense.

**Hubbard's Proffered Medical/Mental-Health Testimony**

At trial, Hubbard testified as to his physical and mental condition. He explained that he is legally blind and that he "get[s] disability" for this condition. He also testified that he receives disability for "mental reasons." His trial counsel asked him about the medications he takes, and the state objected on relevance grounds. Outside of the presence of the jury, Hubbard's trial counsel told the district court that Hubbard's testimony would be that "he's more paranoid" "when he's not on all of his medications" and that the testimony was relevant to Hubbard's claim of self-defense. The district court sustained the state's objection. Later, Hubbard testified that he was not "tak[ing] . . . medication for paranoid schizophrenia," and the district court ordered the jury to disregard "any of the testimony regarding the medication." On cross-examination, Hubbard testified that he invited K.M. into an individual cell because he was "scared" and "[p]aranoid."

**Self-Defense Instruction**

Before closing arguments, Hubbard requested that the jury be instructed on self-defense, asserting that he had satisfied his burden of production to support the instruction. After hearing argument from both parties, the district court denied Hubbard's request. The district court first explained its decision by stating:

> [Hubbard] has not met [the] burden. Specifically, the video shows that [Hubbard] was the aggressor, that [K.M.] did not show any—much signs at all of aggression. There was not much testimony that showed that [Hubbard] had an actual honest belief of imminent danger of death or bodily—great bodily harm.

After a break, the district court came back and clarified its decision by stating:

5

[Hubbard] has not met [his] burden of reasonable evidence to support [his] self-defense claim. The evidence shows that [Hubbard] was the aggressor and [Hubbard] initiated interaction with [K.M.] The video showed that [K.M.] was just sitting at the table in his chair and that [Hubbard] testified that [Hubbard] was trying to get [K.M.] to come back to his cell where there [were] no video cameras to discuss their disagreement. The video showed that [Hubbard] came up . . . behind [K.M.] and put his arm around [K.M.'s] neck and dragged him to the cell. [Hubbard] testified he was afraid of [K.M.] but did not give any reasonable reason to support the belief. Therefore, the testimony offered into evidence to support a self-defense claim is contradictory to the jail video and absolutely and clearly insufficient for any rational jury to come to the conclusion that justified the use of force under the circumstances.

The jury found Hubbard guilty of felony fifth-degree assault. The district court entered the conviction and sentenced Hubbard to 21 months in prison, stayed execution of the sentence, and placed him on probation for five years.

Hubbard appeals.

## DECISION

I.    **The district court did not abuse its discretion when it denied Hubbard's request for a self-defense jury instruction.**

Appellate courts review a district court's determination of whether a jury instruction should be given for an abuse of discretion. *State v. Johnson*, 719 N.W.2d 619, 629 (Minn. 2006). A district court abuses its discretion by refusing to give an instruction on a defendant's theory of the case when the evidence provides a rational basis to support the defendant's theory. *Id.* If, however, the defense was not prejudiced by the district court's refusal to give a specific instruction, "there is no reversible error." *Id.* (quotation omitted). Appellate courts view the evidence in the light most favorable to the party requesting the

instruction. *State v. Jama*, 908 N.W.2d 372, 378 (Minn. App. 2018), *aff'd*, 923 N.W.2d 632 (Minn. 2019).

"The defendant has the burden of going forward with evidence to support a claim of self-defense." *Johnson*, 719 N.W.2d at 629 (quotation omitted). Self-defense consists of four elements: "(1) an absence of aggression or provocation; (2) an actual and honest belief that imminent . . . bodily harm would result; (3) a reasonable basis existed for this belief; and (4) an absence of reasonable means to retreat or otherwise avoid the physical conflict."[1] *State v. Soukup*, 656 N.W.2d 424, 428 (Minn. App. 2003) (holding that the same "principles of self-defense in homicide cases apply to assault cases as well"), *rev. denied* (Minn. Apr. 29, 2003). "The defense is sufficiently raised when a defendant creates a reasonable doubt as to whether the level of force used was justified." *Id.* at 429. Once the defense has met its burden of production, "the state has the burden of disproving one or more of these elements beyond a reasonable doubt." *Johnson*, 719 N.W.2d at 629 (quotation omitted).

In its first explanation for denying a self-defense instruction, the district court found that Hubbard had not met his burden of production on the first element of self-defense because "the video show[ed] that [Hubbard] was the aggressor" and that "[K.M.] did not

---

[1] Regarding the second element, Hubbard argues in his principal brief that this element requires not a fear of bodily harm but merely fear of an offense against the person, relying on this court's decision in *State v. Lampkin*, 978 N.W.2d 286 (Minn. App. 2022). But the supreme court has since reversed our holding in *Lampkin* and clarified that the correct standard is fear of imminent bodily harm. *State v. Lampkin*, 994 N.W.2d 280, 289 (Minn. 2023).

show . . . much signs at all of aggression." Later, the district court clarified its decision by stating:

> The evidence shows that [Hubbard] was the aggressor and [he] initiated interaction with [K.M.] The video showed that [K.M.] was just sitting at the table in his chair and that [Hubbard] testified that [he] was trying to get [K.M.] to come back to his cell where there [were] no video cameras to discuss their disagreement. The video showed that [Hubbard] came up . . . behind [K.M.] and put his arm around [K.M.'s] neck and dragged him to the cell.

Hubbard argues that he met his burden of production on this element because the evidence, when viewed in a light most favorable to Hubbard, showed that (1) K.M. threatened Hubbard twice the previous day, (2) K.M. was the first to engage physically with Hubbard by "ripping" the remote from Hubbard's hand, (3) K.M. made a move toward Hubbard before Hubbard asked K.M. to go in a cell with him and before K.M. sat back down, and (4) Hubbard did not want to fight K.M. when he asked K.M. to go into a cell.

But, even accepting those circumstances as true, they provide no rational basis to find K.M., and not Hubbard, the aggressor in the context of the recorded encounter. The undisputed evidence shows that K.M. was sitting down watching television, not engaging with Hubbard, until Hubbard came and took the remote from K.M. K.M. grabbed the remote back from Hubbard's hand and sat down again at his table for over a minute, unmoving, while Hubbard repeatedly asked K.M. to go into an individual cell with him. Hubbard then suddenly crossed the room, grabbed K.M. by the neck, and dragged K.M. into a cell. Even if K.M. became aggressive when retrieving the remote, K.M. retreated

from the dispute by sitting down and remaining seated while Hubbard continuously attempted to provoke him into a cell.

*Johnson*, the only precedential case that Hubbard cites, does not support his argument that he met his burden of production.[2] In *Johnson*, the supreme court concluded that a self-defense instruction was warranted when there was evidence that the alleged victim pushed, repeatedly hit, kicked, and then shot at the appellant. 719 N.W.2d at 630. This case is factually dissimilar to *Johnson*. Here, there was a period of over one minute after K.M. made any aggressive motion toward Hubbard, during which K.M. sat at a table, unmoving, before Hubbard "defended himself" by putting K.M. in a chokehold. There was no similar cooling-off period in *Johnson*. *See id.* at 623-24. Thus, *Johnson* does not compel reversal here.

Because Hubbard did not meet his burden of producing evidence on the absence-of-aggression element, we conclude that the district court did not abuse its discretion by refusing to instruct the jury on self-defense.

## II.     The district court did not commit reversible error when it restricted testimony related to Hubbard's mental state.

Hubbard also argues that the district court violated his right to testify and present a complete defense by restricting his testimony regarding his mental state at the time of the incident.

---

[2] Hubbard also cites a nonprecedential case, *Beale v. State*, No. A22-0343, 2022 WL 17409899, at *3 (Minn. App. Dec. 5, 2022), in support of his argument. However, "[n]onprecedential opinions . . . are not binding authority except as law of the case, res judicata or collateral estoppel." Minn. R. Civ. App. P. 136.01, subd. 1(c).

"Evidentiary rulings rest within the sound discretion of the district court, and [appellate courts] will not reverse an evidentiary ruling absent a clear abuse of discretion." *State v. Ali*, 855 N.W.2d 235, 249 (Minn. 2014). "[Appellate courts] review a district court's evidentiary rulings for abuse of discretion, even when, as here, the defendant claims that the exclusion of evidence deprived him of his constitutional right to a meaningful opportunity to present a complete defense." *State v. Zumberge*, 888 N.W.2d 688, 694 (Minn. 2017). The district court "abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *Riley v. State*, 792 N.W.2d 831, 833 (Minn. 2011).

"Even if . . . a district court abused its discretion, [appellate courts] reverse only if the exclusion of evidence was not harmless beyond a reasonable doubt." *Zumberge*, 888 N.W.2d at 694. "An error in excluding [defense] evidence is harmless only if the reviewing court is satisfied beyond a reasonable doubt that if the evidence had been admitted and the damaging potential of the evidence fully realized, a reasonable jury would have reached the same verdict." *State v. Olsen*, 824 N.W.2d 334, 340 (Minn. App. 2012) (quotation omitted), *rev. denied* (Minn. Feb. 27, 2013).

Hubbard argues that the district court abused its discretion by excluding his testimony about his mental-health medications and the effect of not taking his medications because his testimony was relevant for two reasons: first, the evidence supported his prima facie case for self-defense; and, second, Hubbard had a due-process right to explain the reason for his conduct even if motive was not a valid defense. But we need not determine whether the exclusion of Hubbard's testimony about his medications was error under either

10

theory if we conclude that any error was harmless beyond a reasonable doubt. *See State v. Courtney*, 696 N.W.2d 73, 79 (Minn. 2005) (explaining that the court need not address whether the admission of evidence violated the appellant's confrontation rights when the court was satisfied that the admission was harmless beyond a reasonable doubt). We therefore turn to the question of the prejudicial effect of any error.

First, Hubbard argues that excluding the evidence impaired his ability to establish a prima facie case of self-defense because it would have tended to prove that he had an actual and honest belief that an offense against his person was imminent—the second element of self-defense. But the district court did not decline to instruct the jury on self-defense because Hubbard failed to meet his burden of production on the second element; rather, the district court denied the instruction because Hubbard failed to meet his burden of production on other elements of self-defense, including that Hubbard was not the aggressor. The excluded testimony would have had no bearing on the other elements of self-defense. Because the district court based its decision to deny Hubbard's request for a self-defense jury instruction on grounds that were not affected by the omission of the testimony at issue, any error in excluding the testimony was harmless beyond a reasonable doubt.

Second, Hubbard argues that excluding the testimony impaired his ability to give his version of events. Hubbard testified about what transpired between K.M. and him and why he grabbed K.M. He explained that he began feeling threatened by K.M. the day before. Then, during his encounter in the dayroom, he felt threatened by K.M. due to K.M.'s physical size and K.M. moving toward him. Hubbard stated that he invited K.M.

11

back to the individual cell not to fight but to "see if [K.M.] had something on his chest, like . . . something against [him]." Hubbard also explained that he invited K.M. into the individual cell because he was "scared" and "[p]aranoid." And he testified that he receives disability benefits for "mental reasons." Considering Hubbard's testimony as a whole, we conclude that, even if the district court had permitted Hubbard to also testify about his medications as part of his version of events, there is no reasonable doubt that the jury still would have reached the same verdict.

### III. Hubbard is not entitled to relief based on his claims of ineffective assistance of counsel and mistreatment at the jail.

In his pro se supplemental brief, Hubbard alleges several instances of ineffective assistance of counsel, including that his attorney (1) did not let him properly view a "disk" until the day the jury viewed it, (2) did not have a doctor testify regarding Hubbard's medications, and (3) "never told [him] about a plea deal."

Criminal defendants have a right to effective assistance of counsel. U.S. Const. amend. VI; Minn. Const. art. I, § 6; *State v. Hokanson*, 821 N.W.2d 340, 357 (Minn. 2012). Appellate courts apply the two-prong *Strickland* test to evaluate an appellant's ineffective-assistance-of-counsel claim. *State v. King*, 990 N.W.2d 406, 417 (Minn. 2023); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the *Strickland* test, the appellant has the burden of showing (1) that their "attorney's representation fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *King*, 990 N.W.2d at 417 (quotations omitted). If one prong is determinative,

the reviewing court need not address the other. *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003). Because ineffective-assistance-of-counsel claims involve mixed questions of law and fact, the standard of review is de novo. *See Strickland*, 466 U.S. at 698.

Appellate courts deem arguments in a pro se supplemental brief forfeited if the brief "contains no argument or citation to legal authority in support of the allegations" and will consider those arguments only if "prejudicial error is obvious on mere inspection." *State v. Taylor*, 869 N.W.2d 1, 22 (Minn. 2015). Hubbard does not identify anything in the existing record to support his claims of ineffective assistance of counsel. Further, an independent review of the record does not reveal any support for Hubbard's claims. We therefore reject Hubbard's claims here. But, to the extent that any of the claims may properly be raised in a petition for postconviction relief, we do not foreclose the claim. *See State v. Gustafson*, 610 N.W.2d 314, 321 (Minn. 2000) (preserving appellant's right to pursue ineffective-assistance-of-counsel claim in a petition for postconviction relief when record on appeal is inadequate to resolve claim).

Hubbard also alleges mistreatment by the jail staff but does not explain how this alleged mistreatment entitles him to a new trial. Because Hubbard's brief provides no argument to support his claim and prejudicial error is not obvious upon mere inspection, we decline to address Hubbard's assertion of mistreatment by jail staff. *See Taylor*, 869 N.W.2d at 22.

**Affirmed.**